**ORIGINAL**

FILED ___RECEIVED
___ENTERED___SERVED ON
COUNSEL/PARTIES OF RECORD

2003 APR 17 A 10: 56

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY_____DEPUTY

1  J. Stephen Peek, Esq.
   Nevada Bar No. 001758
2  Fred D. Gibson, III
   Nevada Bar No. 001474
3  Hale Lane Peek Dennison
    and Howard
4  2300 West Sahara Avenue, 8th Floor
   Las Vegas, Nevada 89102
5  (702) 222-2500

6  Attorneys for Plaintiff
   INTERFACE GROUP – NEVADA, INC.
7  dba SANDS EXPO and CONVENTION CENTER

8

9                    **UNITED STATES DISTRICT COURT**

10                          **DISTRICT OF**            CV-S-03-0407-PMP-RJJ

11 INTERFACE GROUP – NEVADA, INC.
   dba SANDS EXPO and CONVENTION CENTER,
12 a Nevada corporation

13                                            **COMPLAINT**
              Plaintiff,
14                                            **DEMAND FOR JURY TRIAL**

15      vs.

16 PENTON MEDIA, INC., a Delaware corporation

17              Defendant.
                                        /
18 _____

19

20      Plaintiff INTERFACE GROUP – NEVADA, INC. dba SANDS EXPO and CONVENTION

21 CENTER hereby alleges as follows:

22

23              **JURISDICTION, PARTIES AND VENUE**

24      1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as it is a

25 civil action where the amount in controversy exceeds the sum or value of $75,000.00, exclusive of

26 interest and costs, and is between citizens of different states.

27 / / /

28

*(margin, left side)* Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

2.      Plaintiff INTERFACE GROUP – NEVADA, INC. dba SANDS EXPO and CONVENTION CENTER (hereinafter "Sands Expo" or "Plaintiff") is a corporation created pursuant to the laws of the State of Nevada and is licensed to do business in Clark County, Nevada.

3.      Plaintiff is informed and believes and thereupon alleges that Defendant Penton Media, Inc. (hereinafter "Defendant" or "Penton Media") is a corporation created pursuant to the laws of Delaware.

4.      Venue exists in this jurisdiction pursuant to 28 U.S.C. § 1391(a)(2), and within the unofficial southern division of this district, as a substantial part of the events or omissions giving rise to the claims occurred here and a substantial part of the property that is the subject of this action is situated here.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

### (Against Defendant Penton Media)

5.      On or about June 20, 2000, Sands Expo and Penton Media entered into a Facilities License Agreement (hereinafter "the License Agreement"). A true and correct copy of the License Agreement is attached as Exhibit A and incorporated by this reference.

6.      Pursuant to the License Agreement Sands Expo was to provide Penton Media with exhibition and convention center space including three halls and twenty meeting rooms and more than 225,000 net square feet at its Las Vegas, Nevada convention center for a "tradeshow [for] software and hardware companies providing products and services to internet providers" (hereinafter "the Tradeshow") starting September 20, 2002 and ending September 28, 2002.

7.      The License Agreement required Penton Media to pay Sands Expo $512,500.00 as the Minimum Fee for the license of the exhibition and convention center space.

8.      The License Agreement also required Penton Media to pay Sands Expo a Basic Fee which included the Minimum Fee and any Excess Fee for each square foot in excess of 225,000 net square feet used by Penton Media during the Tradeshow.

/ / /

:ODMA\PCDOCS\HLLASDOCS\162863\1

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

9.     The License Agreement required Penton Media to pay Sands Expo the Basic Fee in three installments – a Reservation Fee of $171,000.00 due on April 20, 2001, and the balance of the Basic Fee in two installments of $170,750.00 each, due April 12 and June 12, 2002.

10.     The License Agreement also required Penton Media to pay Sands Expo a Security Deposit of $10,000.00.

11.     The License Agreement further required Penton Media and all of its exhibitors and other invitees to utilize Contractual Services including, but not limited to, electrical wiring and services; plumbing, gas and compressed air services; telephone systems wiring, services and operation; general cleaning and maintenance of authorized areas, and trash collection and disposal; customer service center facilities; rigging; and food and beverage services.

12.     The License Agreement expressly specified that "all monies paid to the Licensor [Sands Expo] by the Licensee [Penton Media], including the Reservation Fee, Basic Fee, Additional Fees, Security Deposit and Additional Charges are non-refundable."

13.     The License Agreement stated that it was expressly made pursuant to the laws of the State of Nevada and that any action relating to the License Agreement shall be maintained in the State of Nevada.

14.     Pursuant to the terms of the License Agreement, Penton Media paid Sands Expo a Reservation Fee of $171,000.00.

15.     According to the express terms of the License Agreement, payment of the Reservation Fee secured the availability of Sands Expo's exhibition and convention center space for the specified dates of the Tradeshow and, therefore, the Reservation Fee was nonrefundable.

16.     Thereafter, Penton Media failed to pay Sands Expo the two installments of the balance of the Basic Fee and the Security Deposit.

17.     The License Agreement specifies that "failing to pay in full and when due any payment required hereunder" constitutes a default of the contract.

18.     The License Agreement provides that in the event of a breach or default by Penton Media, Sands Expo is entitled to, *inter alia,* terminate the agreement, revoke the license given by the License Agreement and accelerate payment of the Basic Fee.

19. On April 12, 2002, and thereafter, Penton Media defaulted on the License Agreement by not paying Sands Expo the first installment of $170,750.00 as required by the express terms of the License Agreement.

20. On or about May 7, 2002, Penton Media further defaulted on the License Agreement by notifying Sands Expo of its intent to cancel the Tradeshow. Penton Media's notification to Sands Expo confirmed that Penton Media beached the License Agreement.

21. On or about May 7, 2002, upon Penton Media's breach of the License Agreement, Sands Expo terminated the License Agreement, revoked Penton Media's license and accelerated payment of the Basic Fee and Security Deposit pursuant to the rights and remedies afforded it by the License Agreement.

22. As a consequence of Penton Media's breach of the License Agreement, the Minimum Fee, Basic Fee, and Security Deposit all became immediately due and payable to Sands Expo in the aggregate amount of $522,500.00.

23. Pursuant to the terms of the License Agreement, the Reservation Fee was to be credited against the Basic Fee owed by Penton Media to Sands Expo. Upon default, the Reservation Fee was credited against the Basic Fee resulting in a net balance of $351,500.00 owed by Penton Media to Sands Expo.

24. The License Agreement expressly provides that all payments not paid when due "shall bear interest at the rate of eighteen (18%) percent per annum from the date due."

25. In accordance with the License Agreement, Penton Media owes Sands Expo interest at the rate of eighteen (18%) percent per annum on the amount of $351,500.00 from the date of default.

26. Sands Expo performed all covenants and conditions on its part to be performed under the License Agreement except those that were prevented or excused by the default, anticipatory repudiation and breach of Penton Media.

27. Penton media defaulted on the License Agreement in that, *inter alia,* it failed to:

    a. pay Sands Expo the remaining two installments of the Basic Fee, totaling $341,500.00, which were due April 12 and June 12, 2002;

    b. pay Sands Expo the Security Deposit of $10,000.00;

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

c. conduct the Tradeshow at Sands Expo ;

d. utilize the Contractual Services required by the License Agreement;

e. designate the Venetian Resort Hotel Casino as the headquarter hotel for the Tradeshow; and

f. pay interest at the rate of eighteen (18%) percent per annum for its default on the amount of $170,750.00 from April 12, 2002 to May 7, 2002, and on the sum of $351,500.00 from May 7, 2002 to the present.

28. Sands Expo at all times stood ready, willing and able to perform all of its obligations under the License Agreement.

29. By reason of Penton Media's default and breach of the License Agreement, Sands Expo is entitled to recover its actual damages in an amount not less than $351,500.00, plus interest at the rate of eighteen (18%) percent per annum from the date of default, as well as consequential and additional damages, which will be proven at trial.

30. Sands Expo has incurred and will continue to incur costs and attorneys' fees in prosecuting this action.

WHEREFORE Plaintiff Interface Group – Nevada, Inc. dba Sands Expo and Convention Center prays for judgment against Penton Media, Inc. as follows:

1. For actual, consequential and additional damages in an amount of not less than $351,500.00 according to proof at trial;

2. For prejudgment interest at the rate of eighteen (18%) percent per annum on the sum of $170,750.00 from April 12, 2002 to May 7, 2002, and on the sum of $351,500.00 from May 7, 2002 to the present, as provided for by the License Agreement;

3 For its costs of suit incurred, including attorneys' fees, to the extent they are provided for by the License Agreement and Nevada law; and

//

//

//

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

4. For such other and further relief as the Court deems just and proper.

DATED this 17 day of April, 2003.

J. Stephen Peek, Esq.
Nevada Bar No. 001758
Fred D. Gibson, III
Nevada Bar No. 001474
Hale Lane Peek Dennison
 and Howard
2300 West Sahara Avenue, 8th Floor
Las Vegas, Nevada 89102
(702) 222-2500

Attorneys for Plaintiff
INTERFACE GROUP – NEVADA, INC.
dba   SANDS   EXPO   and   CONVENTION
CENTER

## DEMAND FOR JURY TRIAL

Plaintiff Interface Group – Nevada, Inc. dba Sands Expo and Convention Center hereby demands a jury trial.

DATED this 17 day of April, 2003.

J. Stephen Peek, Esq.
Nevada Bar No. 001758
Fred D. Gibson, III
Nevada Bar No. 001474
Hale Lane Peek Dennison
 and Howard
2300 West Sahara Avenue, 8th Floor
Las Vegas, Nevada 89102
(702) 222-2500

Attorneys for Plaintiff
INTERFACE GROUP – NEVADA, INC.
dba   SANDS   EXPO   and   CONVENTION
CENTER

Hale Lane Peek Dennison and Howard
2300 West Sahara Avenue, Suite 800, Box 8
Las Vegas, Nevada 89102

Ex. A



CONTRACT # __02  029__

201 EAST SANDS AVENUE • LAS VEGAS, NEVADA 89109 • 702-733-5556

## SHOW NAME: ISPCON 2002

## FACILITIES LICENSE AGREEMENT

This agreement made and entered into this ~~27TH~~ ⌐8Tᴴ day of ~~MARCH~~ ⌐June, 2000 by and between INTERFACE GROUP - NEVADA, INC. (hereinafter "Licensor") and PENTON MEDIA, INC (hereinafter "Licensee"). The Sands Expo and Convention Center (hereinafter the "Facilities") is located at 201 E. Sands Avenue, Las Vegas, Nevada. The Facilities are owned by Interface Group - Nevada, Inc. a Nevada corporation, with offices at 201 E. Sands Avenue, Las Vegas, Nevada (hereinafter "Owner"). The Licensor and Licensee agree as follows:

### ARTICLE I - BASIC LICENSE PROVISIONS

**Section 1.1 Introduction.** The following sets forth basic data and, where appropriate, constitutes definitions of the terms hereinafter listed.

**Section 1.2 Basic Data.**

Date of Agreement: June 8 ~~MARCH 27,~~ 2000

Licensee: PENTON MEDIA, INC

Licensee's Address: ~~20 KETCHUM ST.~~  16 THORNDAL CIRCLE

~~WESTPORT, CT 06880~~  DARIEN, CT 06820

Guarantor: N/A

Authorized Area:  The space licensed is as listed:  HALLS "A, B & C"

MEETING ROOMS (20)

which is (a portion)/(all) of the exhibition and convention space at the Facilities. The Licensee shall also have the non-exclusive right to use in common with others, public or common lobbies, hallways, stairways and walkways designated by Licensor and necessary for access to the Authorized Area; but such rights shall always be subject to the rules and regulations from time to time established by the Licensor pursuant to Section 9.3 and to the right of the Licensor to divide, designate or change from time to time those common areas to be used.

Revised: 03/08/2000

Purpose And Use Of Authorized Area:  The Authorized Area shall be used solely for the purpose of TRADESHOW SOFTWARE AND HARDWARE COMPANIES PROVIDING PRODUCTS AND SERVICES TO INTERNET PROVIDERS (hereinafter referred to as the "Event").

License Period:  The license is granted commencing at 12:01 o'clock AM on SEPTEMBER 20, 2002 and ending at 11:59 o'clock PM on SEPTEMBER 28, 2002 including the following periods designated for:

(a)  Move In - A period from:       12:01AM SEPTEMBER 20, 2002        to 11:59PM SEPTEMBER 23, 2002

(b)  Show Period - A period from:   12:01AM SEPTEMBER 24, 2002        to 11:59PM SEPTEMBER 26, 2002

(c)  Move Out - A period from:      12:01AM SEPTEMBER 27, 2002        to 11:59PM SEPTEMBER 28, 2002

Time is of the essence of this Agreement.

Hours of Operation:       TBD

Exhibition Area(s):       HALLS "A, B & C"

Meeting Room(s):          20 MEETING ROOMS (FROM SEPTEMBER  22 - 26, 2002)     *comp move-in day's (StoH)*

Minimum Fee, Basic Fee and Payment:  Licensee agrees to pay Licensor for the use of Authorized Area the minimum sum of $512,500.00. This Minimum Fee is calculated based upon $.175 per net square foot for move-in and move-out days, and $.35 per net square foot for Show Days for the minimum space of 225,000 net square feet of Exhibit Hall space, and $400.00 per Meeting Room, per day (the "Minimum Fee").   A count of the actual net square footage of Exhibit Hall space used by Licensee shall be taken on SEPTEMBER 25, 2002. Should the net square footage used exceed the required minimum per Hall as follows:

Hall "A"    75,000    Net sq.ft.

Hall "B"    75,000    Net sq.ft.

Hall "C"    75,000    Net sq.ft.

Hall "G"    N/A       Net sq.ft.

then the Licensee shall be billed at $.175 per net square foot for each square foot in excess of 225,000 net square feet for move-in and move-out days, and $.35 per net square foot for each such square foot actually used for displays for Show Days as an "Excess Fee" (the sum of the Minimum Fee and the Excess Fee, if any, shall hereafter be referred to as the "Basic Fee"). The Licensee shall pay the sum of $171,000.00 due on APRIL 20, 2001 as a Reservation Fee to reserve the dates licensed hereunder and to be credited against the Basic Fee. The balance of the Basic Fee shall be paid as follows:

$170,750.00 on JANUARY 12, 2002 ~~APRIL (StoH)~~ and $170,750.00 on JUNE 12, 2002  paid by cashier's, treasurer's or certified check(s) made payable to "Sands Expo and Convention Center" or by wire transfer as directed by Licensor.

Additional Fees:  In addition to the Basic Fee (including Reservation Fee), the Licensee shall pay the following Additional Fees: $N/A.

Security Deposit:  The Licensee shall pay $10,000.00 on AUGUST 20, 2002 to be held thereafter by the Licensor as Security Deposit pursuant to the provisions of Article V.  *Refundable at close of Show on Sept. 26, 2002. (StoH)*

Additional Insureds and Indemnities: In accordance with Article VI, the Additional Insureds and Indemnities are: INTERFACE GROUP - NEVADA, INC., INTERFACE GROUP - MASSACHUSETTS, INC., AND THE LAS VEGAS SANDS, INC. AND THEIR DIRECTORS, OFFICERS AND EMPLOYEES AS ADDITIONAL INSUREDS AND BANC ONE MORTGAGE CAPITAL MARKETS, LLC, AS ADMINISTRATIVE AGENT AND AS COLLATERAL AGENT.

Revised: 03/08/2000

ARTICLE II - LICENSE AND USE OF AUTHORIZED AREA

**Section 2.1 License of Authorized Area.** The Licensor hereby licenses the use by the Licensee of the Authorized Area during the License Period only for the use and purpose and upon the terms and conditions set forth in this Agreement and only for the hours of operation indicated herein and the Licensee hereby agrees to the use of the Authorized Area during the License Period only for the use and purpose and upon the terms and conditions set forth in this Agreement.

**Section 2.2 Prohibited Uses.** The Licensee shall not use or allow the Facilities or Authorized Area therein to be used for any purpose not set forth in Article 1; for any improper, immoral, objectionable or unlawful purposes, in any manner which could cancel the insurance or increase the rate of insurance on the Facilities; in any manner which constitutes waste or nuisance; in any manner which causes damage to the Facilities, including, without limiting the generality thereof, driving any nails, hooks, tacks, screws or other devices into any part of the Facilities or affixing any matter thereto by paste, tape or other adhesive or altering the Facilities in any respect without the prior written approval of Licensor; or in violation of the Facilities Rules and Regulations as such may exist from time to time. Licensee is prohibited from possessing, storing, or bringing onto the property, materials that constitute hazardous materials as defined by federal, state, or local law without prior approval by the Sands Expo and Convention Center. Any requests for approval must include all federal, state or local permits for the possession, storage, use, and transportation of such hazardous material. Approval may be withheld by the Sands Expo and Convention Center for any reason whatsoever in its sole discretion.

**Section 2.3 Development of Plan of Operation Under License.** The Licensee shall provide the Licensor, at least ninety (90) days prior to the beginning of the License Period, all information then reasonably available to the Licensee pertinent to the activities to be undertaken in the Authorized Area pursuant to the License (herein "plan of operation"), including but not limited to:

(i) Floor plans. (4 copies) indicating the design, nature and proposed location of all exhibits and meeting space;

(ii) Utility and construction plans, including plans of all intended rigging;

(iii) All certificates of insurance required hereunder;

(iv) A security plan indicating the number, hours, and location of required security personnel;

(v) Copies of all license applications for licenses required by the Licensor for the purposes and uses of the Authorized Areas set forth in Article I;

(vi) Copies of all approvals obtained from the Fire Marshal and other municipal agencies required by the Licensor before using the Authorized Areas for the purpose set forth in Article 1.

(vii) Such other information as the Licensor may reasonably request.

The Licensor reserves the right, by written notice to the Licensee within twenty (20) days of the receipt of the plan of operation, to require the Licensee to make such changes, deletions, and additions to the plan of operation as the Licensor may reasonably deem necessary or desirable for the purpose of insuring the safe and orderly operation of the Facilities and the Authorized Area. Failure by the Licensee to make any such changes, additions, or deletions required by the Licensor within ten (10) days after such notice shall constitute an Event of Default, as set forth in Article VIII.

**Section 2.4 Licensor's Control and Right of Entry.** In permitting use of the Authorized Areas by the Licensee, the Licensor retains and does not relinquish the right to issue and enforce such rules, regulations and directives as it may deem necessary for the safe, orderly and commercially sound operation of the Facilities. The Licensor and its authorized representatives may enter the Authorized Area after giving prior notice to Licensee, for the purpose of inspecting and checking the same and the uses thereof; of making necessary repairs thereto; of adjusting apparatus or equipment therein; of abating waste, nuisances or violations of law or Rules and Regulations promulgated by the Licensor; of preparing food or readying other concessions; and of ejecting any objectionable person or persons from therein. The Licensee agrees that it will not allow any person at, in or about the Facilities who shall, upon reasonable, non-discriminatory grounds, be objected to by the Licensor and such person's right to use the Facilities and the Authorized Area therein may be revoked by the Licensor.

ARTICLE III - PAYMENT OF FEES, COSTS, CHARGES AND DEPOSITS

**Section 3.1** The Licensee shall pay when due all Additional Fees, Additional Charges, and Security Deposit to the Licensor at 201 E. Sands Avenue, Las Vegas, Nevada 89109 by certified, bank cashier's or treasurer's check payable directly to Sands Expo and Convention Center, or by wire transfer at Licensor's direction.

**Section 3.2** The Licensee shall pay to the Licensor all Basic Fees including Reservation Fees, and Additional Fees as set forth in Article I and Article IV; and all Additional Charges, as set forth in Article VII and Article VIII within seven (7) days after being billed therefore by Licensor.

**Section 3.3** All monies paid to the Licensor by the Licensee, including the Reservation Fee, Basic Fee, Additional Fees, Security Deposit and Additional Charges are non-refundable, except as specifically provided in this Agreement. Licensee acknowledges that all deposits are non-refundable and that payments made pursuant to the liquidated damage provisions set forth in Section 8.6 are fair and reasonable consideration for Licensor's holding the Authorized Areas for the dates indicated for the exclusive use of Licensee and rendering the same unavailable for others. The Licensor shall have no obligation to the Licensee to pay interest on any fees or deposits, and the Licensor shall have the right to commingle such monies with the Licensor's other funds.

**Section 3.4** Any payment required hereunder not paid when due shall bear interest at the rate of eighteen (18%) percent per annum from the date due and shall be payable forthwith on demand by the Licensor. This right to collect interest does not preclude the Licensor from asserting any other rights against the Licensee, including, but not limited to, those set forth in Article VIII.

**Section 3.5** In the event that the Licensee does not fulfill the payment terms for rent, services, fees or any monies due under this agreement, the Licensee acknowledges that in addition to any other remedies that the Licensor has hereunder, the Licensor will be entitled to withdraw monies from deposits or payments made on future contracts between the Licensor and Licensee in order to satisfy or reduce the debt.

Revised: 03/08/2000

ARTICLE IV - SERVICES PROVIDED TO AND BY LICENSEE

**Section 4.1 Services Provided By Licensor For Basic Fee.** The Licensor shall provide, during the show period's hours of operation, without cost to the Licensee, heating, ventilating and air conditioning, permanent overhead lighting, restroom facilities and janitorial services consisting of cleaning of common areas. During move-in and move-out periods, Licensor shall provide only sufficient work lighting in Authorized Areas and janitorial services in common areas only. Licensor shall not be held responsible for and Licensee shall hold Licensor harmless from loss of lighting, air conditioning, electricity, water, gas, heating, or other utilities, facilities or services not caused by the intentional wrongful act of Licensor.

**Section 4.2 Contractual Services Not Included In Basic Fee.** For all services, other than those set forth in Section 4.1 which are the only services covered by the Basic Fee, Licensee agrees that it will, and will require all of its exhibitors and other invitees to, utilize Contractual Services either provided directly by Licensor or by an Authorized Contractor of Licensor. For purposes of this Agreement "Contractual Services" means the labor, equipment, utilities and materials whether sold, rented, or otherwise provided which are required to set up, maintain, protect and remove displays, exhibits, and other items which are constructed or brought into the Facilities as part of the Event, and all related services which customarily are utilized by Licensee, its exhibitors or other invitees when holding or participating in the Event. For purposes of this Agreement, "Authorized Contractor" means those persons or companies Licensor has approved to provide Contractual Services at the Facilities as of the date Licensee executes this Agreement, or as approved as provided below. Licensor reserves the right to withdraw approval of any Authorized Contractor for any reason prior to Licensor's approval of Licensee's Plan of Operation, or at any time thereafter for cause. The Contractual Services to be provided exclusively by Licensor and not by an Authorized Contractor include, but shall not be limited to, the following:

(i)      Electrical wiring and services;
(ii)     Plumbing, gas and compressed air services;
(iii)    Telephone systems wiring, services and operation;
(iv)    General cleaning and maintenance of Authorized Areas, and trash collection and disposal;
(v)     Customer Service Center Facilities;
(vi)    Rigging;
(vii)   Food and beverage services.

Licensor reserves the right to identify additional Contractual Services that may be performed only by Licensor; provided, that absent such identification, these Contractual Services may be performed by an Authorized Contractor. Licensor shall identify those additional Contractual Services it intends to provide on an exclusive basis ~~no later than ninety (90) days prior to the deadline for receipt of Licensee's Plan of Operation, as set forth in Section 2.3.~~     AT TIME OF CONTRACT. (CB)

(i)      ~~Floral~~ and plant services;
(ii)     Custom signage;
(iii)    Security services;
(iv)    Furniture and Equipment Rental;
(v)     Drayage/freight handling;
(vi)    General labor services; and
(vii)   Decorator/General Service Contractor Services.   (CB)

Licensee shall pay Licensor for any Contractual Services provided by Licensor according to the rates shown in the Show Managers Handbook as amended. If not added in the Show Managers Handbook, or if a service is provided for which no rate is stated, then Licensee shall pay Licensor at a rate to be agreed upon by the parties. Licensee shall provide Licensor with notice of the Contractual Services it requires when it files its Plan of Operation in accordance with Section 2.3. Authorized Contractors shall bill Licensee directly at rates agreed to by them and payment shall be made directly to the Authorized Contractor. All bills for Contractual Services rendered by Licensor or Authorized Contractors to Licensee's exhibitors or invitees shall be rendered to and paid directly by the exhibitor or invitee. Licensor shall be under no obligation to provide a Contractual Service it has specifically undertaken to provide unless it or an Authorized Contractor is reasonably capable of providing the service. The ability of Licensor or an Authorized Contractor to provide particular Contractual Services shall be determined at the time the parties agree upon Licensee's Plan of Operation. No Contractual Services shall be utilized or employed by Licensee except as provided in the Section 4.2 or as approved in advance in writing by Licensor. Licensor shall retain, at all times during the License period, the right to sell, advertise, and promote both authorized and Exclusive Contractual Services to Licensee's exhibitors. To facilitate Licensor's provision of Contractual Services hereunder Licensee is required to provide Licensor, at least 120 days prior to the beginning of the License Period, with a list of all exhibitors or other invitees planning to use the Authorized Areas during the License Period, and with the business address, telephone number and name of the appropriate person to be contacted for each such exhibit.

**Section 4.3 Security of Facilities.**
(a) The Licensor shall neither be responsible for any property brought into the Facilities by the Licensee or any person claiming under the Licensee, nor be obligated to watch, guard or protect the same; nor shall the Licensor be liable for any failure to do so by any guard, watchman or protection service employed by the Licensor or by any guard, watchman or protection service contracted for by the Licensee.
(b) After reviewing Licensee's plan of operation, Licensor and Licensee shall jointly determine the minimum number of security guards reasonably necessary to preserve order and to protect persons and property during the License Period.
(c) Except by arrangement with the Licensor and/or its designated security guard service provider, no guard, watchman or protection service shall at any time be stationed in the Facilities by the Licensee or any other person claiming thereunder; and except by such arrangement, no person shall be allowed in or remain in the Facilities after it has closed.

**Section 4.4 Registered Nurse Or Other Medical Personnel.** The Licensee shall maintain at the Facilities at all times during the License period a registered nurse or other medical personnel (at Licensor's direction), fully licensed as such in the State of Nevada. The Licensee shall, at its expense, contract with the Licensor's exclusive service provider for such services.

**Section 4.5 Concessions and Catering.** The Licensor reserves, and at all times shall have, the sole right to operate or have operated in its behalf all commercial enterprises, including all concessions, bars and catering operations and to sell or otherwise provide flowers, food, refreshments, beverages, cigars, cigarettes, candies and periodicals, and to grant concessions to designated airlines, auto rentals, delivery services, shoe shine, and others.

**Section 4.6 Headquarters Hotel.** The Venetian Resort Hotel Casino, located adjacent to the Sands Expo and Convention Center, is a new Hotel property offering 3,036 sleeping rooms, and a convention complex featuring large ballrooms and breakout meeting space, over 150,000 square feet of casino space, multiple restaurants, and approximately 500,000 square feet of retail space. Licensee agrees to designate the Venetian Resort Hotel Casino as "headquarter hotel" location for its show. Further, Licensee will use its best efforts to assist Licensor in its solicitation of Licensee's exhibitors and invitees for their food, beverage, function, and hospitality business.

**Section 4.7 Advertisements, Posters and Marquee.** The Licensee agrees not to post or exhibit or allow to be posted or exhibited signs, advertisements, show-bills, lithographs, posters, or cards of any description (herein "signage") in any area of the Facilities other than within the Authorized Areas except with the prior written approval of the Licensor. If such approval is granted by Licensor, Licensee shall pay a fifteen (15%) percent commission from the gross revenues paid by the advertising entity. The advertising entity is defined as the party whose organization, business or concern is advertised on the signs advertisements, show bills, banners, lithographs, posters, or cards. Any signage to be posted or exhibited in any area of the Facilities other than the Authorized Areas shall be upon the regular billboards, if any, provided by the Licensor therefore. The Licensee will use, post or exhibit only such signage as is related to the Event in the Authorized Areas and during the hours for which this License was granted and for such period of time as designated by the Licensor.

**Section 4.8 Use of Licensor's Equipment.** If any equipment provided by the Licensor to the Licensee requires an operator or technician, such operator or technician may, if required by the Licensor, be supplied by it to operate such equipment, and the Licensee shall pay for such equipment and technician or operator the amount set forth in the Show Manager's Handbook.

## ARTICLE V - SECURITY DEPOSIT AND PERFORMANCE BOND OR GUARANTY

**Section 5.1 Security Deposit.** With respect to the Security Deposit specified in Article I, the Licensee agrees that the same will be paid on the date set forth in Article I, and that the Licensor shall hold the same throughout the License Period as security for the performance by the licensee of all obligations on the part of the Licensee hereunder. The Licensor shall have the right from time to time, without prejudice to any other right or remedy the Licensor may have hereunder or by law, to apply, without notice to the Licensee, such deposit, or any part thereof, to the Licensor's damages arising from any Event of Default caused by the Licensee or to pay any of the Licensee's obligations for any of the Exclusive Contractual Services contracted for by the Licensee pursuant to Article IV. If the Licensee is not in default under this Agreement at the time of final accounting, the Licensor shall return the Security Deposit, or so much thereof as shall not theretofore have been applied in accordance with the terms of this Section 5.1, to the Licensee.

**Section 5.2 Performance Bond or Guaranty.** Upon request by the Licensor, the Licensee shall furnish to the Licensor a performance bond or sufficient guaranty in substance and amount determined by Licensor.

## ARTICLE VI - INSURANCE, INDEMNIFICATION AND WAIVER OF SUBROGATION

**Section 6.1 Insurance.**
(a) The Licensee shall provide and keep in force during the License Period the following insurance (in addition to any other insurance Licensor may deem necessary):
(i) Workers' compensation insurance in accordance with Nevada Law covering Licensees' employees.
(ii) Employers' Liability insurance for Nevada operations in minimum limits of One Million Dollars ($1,000,000) per occurrence.
(iii) Commercial General Liability insurance including blanket contractual liability and personal injury coverage with limits of Liability of at least One Million Dollars ($1,000,000) in any one occurrence.
(iv) Comprehensive Automobile Liability insurance insuring any owned, non-owned, and hired vehicles to be used in and out of the "Facilities" in the amount of One Million Dollars ($1,000,000) in any one occurrence.
All insurance required shall be issued by companies authorized to do business in the State of Nevada. Licensee shall have completed by its insurance agent the Certificate of Insurance provided by Licensor and/or separate certificates for Nevada Workers' Compensation. Licensee shall deliver such completed certificates of insurance to Licensor at least ninety (90) days prior to the beginning of the License Period. All required insurance policies shall name as additional insured those entities set forth in Article I as "Additional Insureds and Indemnities".
All required insurance policies shall provide that (i) the insurance carrier will give written notice to Licensor at least thirty (30) days prior to any material change in, cancellation, or non-renewal of the policy. Licensee's failure to provide such certificates or policies, as the case may be, within the period specified herein shall constitute a breach of the Licensee's duties and obligations hereunder.
(b) The Licensee shall obtain and maintain during the License Period insurance policies on all personal property owned, leased or hired by, or in the care, control or custody of the Licensee during the License Period. Such policies shall provide coverage for "all risks", including earthquake, flood and theft, with a deductible per loss of not more than $1,000.00.

**Section 6.2 Indemnification and Hold Harmless Agreement.**
(a) The Licensee hereby releases and discharges and indemnifies, and agrees to keep indemnified, defend, protect and save harmless the Licensor and those named Additional Indemnities set forth in Article I (herein "Indemnities") of and from any and all claims, demands, liabilities, damages, costs, losses and expenses (including attorneys' fees and disbursements) for any injury to, including death (whether they be third persons or employees of either the Licensor or the Licensee) and any loss (through theft or otherwise) of or damage to property (whether it be that of the Licensor or the Licensee or a third person) caused by, growing out of, or happening in connection with or with respect to the use by the Licensee, or of any other person or legal entity with the permission (express or implied) of the Licensee, of the Facilities or its equipment. Such indemnification by the Licensee shall apply unless such damage or injury results from the sole negligence, gross negligence or willful misconduct of the Licensor.
(b) Without limiting the forgoing, the Licensee assumes all costs and expenses arising from the use of, broadcast, performance or publication, including musical or other audio or visual presentation, of patented, trademarked, or copyrighted materials, equipment, devices, processes, or dramatic rights used during or incorporated in the conduct of its operation hereunder; and the Licensee agrees to indemnify and hold harmless the Indemnities from all damages, costs and expenses at law or for equitable relief for or on account of any patented, trademarked or copyrighted materials, equipment, devices, processes or dramatic rights furnished to or used by the Licensee or its exhibitors, or any infringement with respect thereto in connection with this License, including the costs and expenses of defending any such action, even if it be groundless or fraudulent.
(c) Without limiting the foregoing, the Licensee shall also indemnify and save harmless the Indemnities from all claims, demands, liabilities, damages, costs, losses and expenses made against or incurred by any of the Indemnities arising out of injury or loss to third parties caused by Licensee's failure to return the Authorized Area to the Licensor, vacate the Facilities, relinquish the Licensor's or Authorized Contractor's equipment at the end of the License Period, or Licensee's breach of any contract or agreement with a third party to provide contractual or other services.

Revised: 03/08/2000

Section 6.3 Waiver of Subrogation.  The Licensee hereby waives any and every claim which arises in its favor and against the Licensor, or against any of the Additional Indemnities set forth in Article I, for any and all loss or damage covered by valid and collectible insurance policies to the extent of the insurance proceeds paid with respect thereto.  Such waiver shall be in addition to, and not, derogation of, any other waiver or release contained in this License with respect to any loss or damage to property of the Licensees.  Inasmuch as the waiver will preclude the assignment of any aforesaid claim by way of subrogation (or otherwise) to an insurance company (or any other person), the Licensee shall notify its insurers of such waiver.

## ARTICLE VII - LICENSEE'S OBLIGATION AT END OF LICENSE PERIOD

Section 7.1 Return of Authorized Area.  At the end of the License Period, the Licensee shall vacate the Facilities and return the Authorized Area and the Licensor 's equipment to the Licensor, all in the same broom clean condition and repair as originally furnished to the Licensee, normal wear and tear excepted.  At such time, the Licensee shall remove completely from the Facilities all goods, wares, merchandise and property of any and all kinds and description placed therein (herein "Property").

Section 7.2 Repair of Authorized Area.  The Licensee agrees that if the Authorized Area, Lobbies, Hallways, Restrooms or other Public Space, or any other part of the Facilities, shall be damaged by the act, default or negligence of the Licensee, or of the Licensee's agents, employees, patrons, guests or invitees, the Licensee will pay to the Licensor upon demand such sum as shall be necessary to restore said areas to their present condition.  The Licensee hereby assumes full responsibility for the character, acts and conduct of all persons acting for or on behalf of said Licensee.

Section 7.3 Failure to Return the Authorized Area or Vacate the Facilities.  In the event the Licensee shall fail to return the Authorized Area to the Licensor or to vacate the Facilities in accordance with the provisions of Section 7.1, the Licensor is authorized, at the Licensee's expense, to remove therefrom and to store or return to the Licensee or, except where the Licensee's failure to do so is caused by an event beyond the Licensee's control, such as a strike beyond its control, a national emergency or an Act of God, to treat the same as abandoned and discarded property and accordingly dispose of the Property.  The Licensor shall not be liable for any damages or loss to the Property which may be sustained either in the course of such removal or in the course of storage, or in the course of transit, or by virtue of the Licensor's disposal of the Property and the Licensor is hereby expressly released from any and all such claims for damages of whatsoever kind or nature.  The Licensor shall be under no duty, however, to so remove, store or return the Property.

Section 7.4 Extended Use Charge.  The Licensee shall pay an Extended Use Charge equal to twice the per diem Basic Fee applicable to Show Days for each day or portion of a day after the end of the License Period that the Licensee has failed to return all or any part of the Authorized Area to the Licensor and vacate the Facilities in accordance with the provisions of Section 7.1, unless said failure is caused by any of the following events, to the extent that such event is beyond the Licensee's reasonable control:  fire, flood, riot, earthquake, civil commotion, or Act of God.  The liability to pay an Extended Use Charge does not in any way extend the License Period; is not liquidated damages; is intended as a penalty against the Licensee for use of the Facilities or the Authorized Area beyond the License Period; and does not preclude the Licensor from asserting any other rights against the Licensee, including, but not limited to, those set forth in Section 7.3 and Article VIII.  The Extended Use Charge is due and payable at the end of each day for which the Charge is assessed.

## ARTICLE VIII - DEFAULT AND REMEDIES

Section 8.1 Events of Default.  The occurrence of any of the following shall be considered an "Event of Default":
(a) The Licensee shall fail to pay in full and when due any payment required hereunder, whether said payment was required to be paid to the Licensor or any Authorized Contractor;
(b) The Licensee shall fail to pay promptly any sales, use, excise or other taxes when due or fail, upon request of the Licensor, to provide evidence of same to the Licensor;
(c) The Licensee shall fail to obtain or pay for any and all necessary permits and licenses, including union or trade organization clearances, and Fire Marshal approvals, when and where required, or fail, upon the Licensor's request, to provide evidence of such permits or licenses to the Licensor;
(d) Any other default or breach of any covenant or agreement contained herein including the specific duty to provide evidence of insurance coverage as provided in Article VI.
(e) The Licensee shall make an assignment for the benefit of creditors or shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future Federal, State or other statute, law or regulation for the relief of debtors, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Licensee or of all or any substantial part of its properties, or shall admit in writing its inability to pay its debts generally as they become due;
(f) A petition shall be filed against the Licensee in bankruptcy or under any other law seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief.
(g) Licensee shall materially diverge from the plan of operation without the prior written consent of Licensor.

Section 8.2 Licensor's Remedies Upon Event of Default.  Upon the occurrence of any of the Events of Default set forth in Section 8.1 or elsewhere in this Agreement which default continues for a period of five (5) days after written notice from Licensor specifying the nature of such default, Licensor may exercise any or all of the following:
(a) accelerate payment of the Basic Fee;
(b) require that Licensee give additional security for Licensee's performance of its obligations;
(c) declare this Agreement terminated and revoke the license given hereby;
(d) enter and take exclusive possession of and remove all persons and property from the Authorized Areas and the Facility;
(e) assert and enforce claims against any bond provided under this Agreement;
(f) refuse to commence, or discontinue the rendition of all services or utilities to Licensee and the Authorized Area;
(g) apply monies from deposits or payments made on future contracts between the Licensor and Licensee to satisfy or reduce the debt;
(h) for late payment of one contract, cancel any or all subsequent contracts at Licensor's option.
Licensee waives any right it may have as to notice or hearing prior to the exercise of the powers set forth above.  The rights and remedies of Licensor shall be cumulative, and none shall exclude other rights or remedies allowed by law or at equity, or set forth in other sections of this Agreement.

Revised: 03/08/2000

Section 8.3 Remedying Defaults.  The Licensor may, but shall not be required to, pay such sums or to do any act which requires the expenditure of monies or services which may be necessary or appropriate by reason of the failure or neglect of the Licensee to perform any of the provisions of this License.  In the event of the exercise of such right by the Licensor, the Licensee agrees to pay to the Licensor forthwith upon demand all such sums expended by the Licensor (or the fair value thereof, whichever is greater), together with interest thereon at the rate of eighteen (18%) percent per annum, as an Additional Charge.

Section 8.4 Termination Without Default.  In the event that the Authorized Area or the Facilities of which it is a part or any portion thereof, are destroyed or damaged by fire or other casualty so that in the reasonable judgement of the Licensor its or the Licensee's use thereof would be substantially interfered with, or in the event of a taking of all or a portion of the Facilities by eminent domain, condemnation or foreclosure, then the Licensor may terminate this Agreement upon giving to the Licensee notice of termination not more than ninety (90) days following the event of destruction, damage or taking and this Agreement shall terminate on the date set forth in such notice of termination, all with the same force and effect as though the License Period of this Agreement had originally been scheduled to expire on such date, and Licensor shall return to the Licensee all monies theretofore paid by the Licensee to the Licensor as a Security Deposit, Reservation Fee, Basic Fee or Additional Fee (to the extent not applied by Licensor in accordance with the terms hereof).

Section 8.5 Right to Re-enter.  If this License shall have been terminated as provided in this Article, or if any execution or attachment shall be issued against the Licensee or its Property whereupon the Authorized Area shall be taken or occupied by someone other than the Licensee, then the Licensor may, without notice, re-enter the Authorized Area, without being liable for any prosecution thereof, and remove the Licensee and all other persons and any and all property from the same, as if this License was not in effect.

Section 8.6 Liquidated Damages.  If the Licensee cancels the Event covered by this License, the Licensee agrees to pay to the Licensor, as liquidated damages and not as a penalty an amount equal to the Reservation Fee and the remainder of the Basic Fee, as set forth in Article I.  The parties hereto agree that such amounts constitute reasonable provision for liquidated damages and acknowledge that the amount of actual damages will be difficult to establish.

In any event, and in addition to the foregoing, the Licensee also agrees to pay any monies due for Additional Fees and Additional Charges.  The foregoing shall not constitute Licensor's sole remedy for such cancellation and shall be in addition to such other legal and equitable rights and remedies as may be available to Licensor.

Section 8.7 Liens.  To secure the Licensee's obligation hereunder, Licensee hereby grants the Licensor the first right of lien against all ticket office receipts and Property of the Licensee hereunder.  The Licensor is empowered to withhold from ticket office receipts such amount as is outstanding and owed by the Licensee hereunder.  If the total ticket office receipts are insufficient to cover such unpaid amounts the Licensor shall have the right to impound the Licensee's Property at the Facilities, or elsewhere, at the Licensee's expense.  If such unpaid amounts remain unpaid for a period of ten (10) days after the termination of this License, the Licensor shall have the right to sell the impounded Property at public auction and to apply the cash proceeds from the auction less its costs, including attorneys' fees, to the retirement of said unpaid amounts.

Section 8.8 Actions.  Any action by one party to this License against another arising hereunder shall be maintained in the State of Nevada; and the Licensee hereunder consents to same and to the maintenance of such action by the Licensor against it in said State of Nevada.

Section 8.9 Cumulative Remedies.  All rights, powers and privileges contained hereunder upon the Licensor shall be cumulative and shall not be restricted to those given by law.

Section 8.10 Force Majeure.  In the event that the Licensor's obligations to the Licensee under this Agreement be delayed, prevented or rendered impractical by any of the following events:  fire, flood, riot, earthquake, civil commotion, strike, lockout, labor disturbances, explosion, sabotage, accident, war, other casualty, Act of God, or any law, ordinance, rule or regulation which becomes effective after the date of this License or any other cause beyond Licensor's reasonable control the Licensor shall not be liable to the Licensee for such delay or failure to perform.  The Licensee hereby waives any claim for damages or compensation for such delay or failure to perform, other than a return to it of any monies paid directly to the Licensor, but no other.

Section 8.11 Subordination.  This Agreement and any renewals, extensions or amendments hereof, and all of Licensee's rights and obligations hereunder or thereunder now or hereafter existing, are unconditionally subject, inferior and subordinate in priority to any mortgage, deed of trust or other security interest or lien encumbering the Facilities (or any portion thereof) from time to time and to the lien of any renewals, extensions, amendments or refinancings thereof (each, a "Mortgage") and the rights, powers and privileges of any beneficiary or trustee thereunder.  Notwithstanding the foregoing, at the election of such holder or beneficiary, exercisable in its sole discretion at any time, its Mortgage shall be subject, inferior and subordinate to this Agreement.  If such holder or beneficiary shall make such election, and if the holder of such Mortgage shall exercise any remedies under or in connection with such Mortgage (or in lieu thereof) after a default by Licensor under such Mortgage then, at the option of any owner of the Facilities (or the applicable portion thereof) (after giving effect to such exercise) the Licensee shall recognize such new owner and this Agreement shall remain in full force and effect as between such new owner, as Licensor, and Licensee, as licensee.

Section 8.12 License and not a Lease.  Notwithstanding anything to the contrary contained herein, this Agreement is a license and not a lease and this Agreement shall be construed to be a license and not a lease.

ARTICLE IX - MISCELLANEOUS PROVISIONS

Section 9.1 Non-Discrimination.  The Licensee shall not discriminate against any person or persons in connection with admission, services or privileges offered to or enjoyed by the general public because of race, creed, ancestry, sexual orientation, disability, color, sex, marital status, age, religion or national origin.

**Section 9.2 Audio/Visual Presentations.** The Sands Expo and Convention Center does not regulate, control, approve or disapprove any broadcast, performance or publication of music or any other audio or visual presentations. The Sands Expo and Convention Center does not play or perform any music, nor does it offer referrals or contracts with anyone who does. If the Licensee, or an exhibitor, wishes to use copyrighted music or other copyrighted material it will be necessary for Licensee to make arrangements with the appropriate owners of such material or agents of such owners for a license to use or perform such copyrighted music or material or to otherwise qualify for an exemption. The Sands Expo and Convention Center retains the right to regulate the volume of any sound, whether it be music, voice, special or artificial effects to the extent that the same interferes with other licensees within the facilities or is determined to be offensive or otherwise violates the rules and regulations or License Agreement.

**Section 9.3 Rules and Regulations.** The Licensor's Rules and Regulations are hereby incorporated into this Agreement by reference. Copies of such Rules and Regulations have been provided to the Licensee and the Licensee hereby acknowledges receipt thereof. The Licensor reserves the right to change such Rules and Regulations in writing from time to time and will provide the Licensee with such changed Rules and Regulations which shall be binding upon the Licensee. If there is at any time a conflict between the provisions of this Agreement and the Rules and Regulations, the provisions of this Agreement shall control.

**Section 9.4 Waiver.** The failure of either party hereto at any time or times to require performance of any provisions hereof shall in no manner affect its right at a later time to enforce the same provision. Any waiver by any party or the breach of any provision contained in this Agreement in any one or more instances shall not be deemed to be a waiver of any other breach of the same provision or any other provision contained herein.

**Section 9.5 Notices.** Any notices or other communications required or permitted hereunder shall be sufficiently given if delivered by a customary overnight delivery service, or if sent by certified or registered mail, postage prepaid, to the Licensor or the Licensee, as the case may be, at the address as set forth for each in Article I of this Agreement or to such other address as any party shall have provided to the other parties from time to time in accordance with the provisions of this Section 9.5.

**Section 9.6 Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereto and supersedes all proposals, negotiations and understandings of any nature whatsoever. This Agreement may be changed or amended only by a written instrument duly signed by all of the parties hereto. This agreement must be signed by Licensee and returned within thirty (30) days from the date of Agreement set forth in Article I. If not so returned to Licensor this Agreement shall, at Licensor's option be rendered null and void. In any event, this Agreement shall not be enforceable until signed by Licensor.

**Section 9.7 Binding Effect, Assignability.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement or any rights hereunder may not be assigned by the Licensee without the express written consent of Licensor, which consent will not be unreasonably withheld.

**Section 9.8 Captions.** The captions of the several provisions of this Agreement have been inserted for convenience only and do not constitute a part of this Agreement.

**Section 9.9 Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Nevada applicable to contracts made and to be performed wholly within such state.

**Section 9.10 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 9.11 Signatures.** If you are in agreement with the contents of this contract, please sign on the space indicated and return by May 11, 2000. If not executed and returned by said date, this offer shall automatically terminate. Space is confirmed on a definite basis ONLY after receipt of this agreement signed by you and counter-signed by the Convention Center General Manager.

IN WITNESS WHEREOF, the Licensor and Licensee have caused this agreement to be duly executed under seal by persons hereunto duly authorized, as of the Date of Agreement set forth in Article 1.

LICENSOR:
INTERFACE GROUP - NEVADA, INC.

LICENSEE:
PENTON MEDIA, INC

BY: _____
RICHARD, HELLER, PRESIDENT AND GENERAL MANAGER

BY: _____
SAMANTHA HAMMER
DIRECTOR, EXHIBIT OPERATIONS

DATE: _____6-20-00_____

DATE: _____

Revised: 03/08/2000